HOMER COURTNEY, et al. v. HARRIET C. COURTNEY, et al.

Eastern Section. April 7, 1928.

Petition for Certiorari denied by Supreme Court, July 14, 1928.

R. H. Ward, of Kingston, for appellant.

Harris & Evans, of Harriman, J. H. Underwood, Homer H. Wallace, both of Clinton, and J. W. Stone, guardian ad litem, of Harriman, for appellee.

SNODGRASS, J.   The bill was filed to set up a lost deed allegedly made subsequent to or as superior to a will, which had been probated, and which purported to dispose of the lands differently than that which was said to be evidenced by the said deed.

From the face of the record the contest is between the ten children of J. C. Courtney, deceased, by his second wife, with reference to certain lands that were owned by the deceased in his lifetime under the deed filed as Exhibit A to the bill, from Maggie Russell and others to J. C. Courtney.

The will provided that the real estate should go to the ten children of the last wife in equal proportions, but with a life estate to the widow of the deceased as long as she should remain such widow. She was given the personal property under the will, which also provided for two daughters, the children of a former marriage, by giving them certain other property.

The bill was filed by three of the children of the last marriage, being minors and the only sons of the deceased, through the intervention of a next friend, against all the other children of the deceased, including those of the first marriage, and against the mother, the widow, with the object indicated.

The bill averred that these three complainants were the owners as tenants in common of the land subject to a life estate of defendant Harriet C. Courtney, their mother, and that the said two tracts of land were worth from eight to ten thousand dollars; that they were not located near any town, and were adapted exclusively to farming

purposes, except the second tract described, which consisted of a valuable millsite located on East Fork or Poplar creek, but that, containing no improvements, it was not then being used for mill purposes. It was averred that it would be manifestly to the advantage of the parties that said land be sold for partition instead of partitioned in kind, there being on said two tracts of land only one set of buildings and a small amount of timber; that complainants were advised that defendant Harriet C. Courtney had signified her willingness, and that she was now willing that said lands be sold in fee and that she take her life estate in said lands in money, in order that the purchaser or purchasers of the land might secure an indefeasible title in fee; and the bill sought a sale.

The bill also set forth a condition in which it was charged that a receiver was desirable; that taxes were delinquent for two or three years, and that the life tenant in possession had nothing out of which to pay them, and that conditions threatened irreparable injury to complainants. It sought the appointment of a receiver to take charge, rent and otherwise look after the land during the pendency of the suit, and averred the willingness of the alleged life tenant to such appointment. The bill sought general relief.

The bill was demurred to, amended, and the demurrer overruled. It was more than once amended, but in effect presented the questions indicated.

Pro confesso was taken as to Zeta Hunley and Minnie, the children of the first marriage. Flora Courtney Qualls, Edith Jernigan, Bernice Harmon, May King and Maggie Burris filed answer and cross-bill.

The cross-bill admitted the ownership of the land in dispute by their father through the purchase alleged. They admitted the execution of the will and its probate after the death of their father, and as such properly evidenced title in all of the children of the last marriage, as well as evidencing title in other lands in the two children, Minnie Pemberton and Zeta Hunley, of the first marriage, and a life estate or as long as she remained the widow of their father, to Harriet Courtney, but they denied that the will was a nullity as claimed. The answer maintained the effectiveness of the will as disposing of the property, and denied that any such deed as in the bill described was ever made, signed or delivered to the complainants, or any of them. It was denied that Harriet C. Courtney the widow had any interest in the land, having, it was alleged, remarried. It was admitted that the widow had lived on and controlled the land since the death of her husband, and that she had defaulted in the payment of the taxes. It was stated that neither their interest or the interests of the minor complainants could be injured by a sale of the life estate, therefore it was not necessary that a receiver be appointed.

The cross-bill set up the will and its probate by the widow, maintained its validity according to its terms and claimed under it. It averred that Walter Burris had been duly and regularly appointed guardian of the minors, the original complainants, that he was a resident of Anderson county and a proper party to the suit; averred that under the circumstances which it detailed it was for the manifest interest of all parties that the land be sold for partition. It prayed for process, and that guardian ad litem be appointed for Ruth and Helen Courtney; that at the hearing the children of Harriet C. and John C. Courtney be declared to be the owners in fee as tenants in common of the tracts of land described in the bill, and that the same be sold under decree of the court for partition and the proceeds divided equally among them.

Guardian ad litem was appointed for the two girls mentioned, who answered, placing the rights of his wards under the protection of the court.

It is proper to say that an original bill had been filed maintaining that the appointment of Walter Burris as guardian of the original minor complainants was inimical to their interests and fraudulent, and, upon amendment of the bill filed in this cause these proceedings were exhibited, and it was asked that a guardian ad litem be appointed to defend for said minors under the cross-bill, and the court appointed the counsel in the original bill as guardian ad litem for these minors to the cross-bill, who filed their answer thereto, likewise placing the interests of his wards under the protection of the court, but maintaining them as under the original bill.

Such were the issues, upon which proof was taken and the cause heard before the Chancellor, sitting, as maintained by appellees, as a jury, but, as maintained by appellants, unaffected by any jury demand or status.

The Chancellor made a finding in favor of the original complainants on nearly every contention of theirs, except as to any delivery of the deed claimed by them, as to which he found in favor of defendants. He declined a further and contrary finding (except as to such delivery) in favor of original defendants, and predicated his holding simply upon the fact that the original deed as claimed by complainants, while it had been signed and acknowledged, had never been delivered, and was therefore ineffectual to create an estate in said original complainants and a life estate in the widow, Harriet Courtney Strader, which resulted in the dismissal of the bill of original complainants and in sustaining the cross-bill, and a decree ordering a sale of the lands thereunder for distribution of proceeds.

The original complainants excepted to the decree and appealed therefrom, which was:

"Allowed upon their giving a proper bond or otherwise complying with the law, which purpose the complainants are given thirty days in which to perfect their appeal bond."

Appellants attempted to do this by filing a pauper oath, to which exception is taken, both as to its sufficiency if it had been properly filed, and as to its efficacy to bring up the case if sufficient.

We think the order would have been complied with had either a bond or a proper oath in lieu thereof been given. On the application to amend and thus cure the defect the bond filed November 14, 1927 will be treated as a sufficient obviation of any defects in the oath, and the motion to dismiss the appeal for such defect in the statements of the oath is overruled.

Neither do we think there is any virtue in the motion of appellants to strike the reply brief because it does not take up and answer specifically each assignment as made by appellants. We think the reply earns its title to consideration if it is sufficiently comprehensive.

One question made in the reply brief, and upon which this court is asked to affirm the decree of the Chancellor is, it is insisted that this is a jury case and that the case was heard by the Chancellor sitting as a jury, the actual presence of the jury having been waived; that no motion for a new trial was made, for which reason it is claimed that no status for a review of this case can be claimed. It is insisted that in jury cases in the chancery court the practice is the same as in the law court with reference to the right of the Chancellor to have this first hand chance at the correction of any errors of the jury, or of his own when he sits in their stead, without which it will be presumed in this court that the decree was correct in all particulars, at least which would involve its review other than for errors in the technical record.

Another claim is, that while the Chancellor was correct in holding that no deed had been delivered, he was in error in holding that any deed of the character claimed by complainants had ever been signed or acknowledged, much less delivered, and in relation thereto it is insisted (which the Chancellor declined to find),

"That a deed had been signed and acknowledged by John C. Courtney before the execution of the will, but that the provisions of said deed were not those as set out in complainants' amended bill, but was destroyed before delivery, and that the will was later drawn, and was a good and valid will.

"2nd. That the deed drawn by Charles C. Jackson the 9th of November, 1918 was drawn for Harriet C. Courtney, but that said deed was never signed, and was drawn because the will prevented her from a second marriage after the death of her husband, and

that she attempted to get the last deed signed, but never succeeded in doing so."

The first insistence, if well founded, would result in the affirmance of the decree without the necessity of any examination of the assignments involving the evidence, and a favorable finding as to the facts claimed by the defendants to the original bill and cross-complainants would dispose of every claim made by the original bill, leaving only the dependent questions on the cross-bill, save those relating to errors in the admission of evidence.

We do not think any error was committed by the Chancellor in allowing the cross-examination of Harriet C. Courtney to go to the jury, as claimed in the fourth assignment of appellants. This was a cross-examination of the witness whose evidence was relied on mainly to set up the alleged lost or destroyed will, especially its delivery. It affected her credit, and was admissible as a circumstance.

Nor was any error committed in the admission of the evidence of John H. and Mary Qualls, as specified in the fifth and sixth assignments.

It was insisted that this suit was a conspiracy between Harriet C. Courtney and counsel for the minor children mentioned in the original bill; that he in effect was really the counsel of Harriet C. Courtney, the widow, and was serving her interests in the setting up of this alleged deed, as by her marriage she had forfeited her interest under the will.

It was claimed that there had been a deed executed before the will, in which the father had conveyed to these three minor sons the property described, but had charged it with the payment of $500 to each of the girls of his last marriage; that he had never delivered such deed and, becoming dissatisfied with it had directed his wife to destroy it, believing that the boys would be unable to or would not pay the girls, some of whom were minors also, who had helped him; that thus repentant at the possible injustice he was about to inflict upon them he made a will in lieu thereof, and that the second deed made after the execution of the will was never signed at all, but that a part of it had been attempted to be foisted as a part of the deed that had been destroyed by the widow. This evidence was competent as bearing upon these issues, and was rightfully admitted.

Notwithstanding the somewhat serious implication it involves we are of opinion that the weight of the evidence sustains the contention of appellees, from which it would appear that this is but a thinly veneered purpose on the part of the widow to regain by the setting up of this deed what she forfeited under the terms of the will by her second marriage. We should have no doubt at all in this conclusion, save that counsel has testified he saw the deed that had been signed

and acknowledged before A. W. Christenberry some year and a half before he filed this bill, in 1925; that it had been delivered to him at that time by Mrs. Courtney with other papers, retained by him thirty or sixty days, and then returned to her. Also Mrs. Fields, a sister of Mrs. Courtney, testified that she had seen it after the death of Mr. Courtney, and that she had seen her sister destroy it. As militating against the testimony of counsel for original complainants, two of the other lawyers in the case testified, substantially, that counsel had told them at the December term of court at Kingston, that he had just learned that John C. Courtney and his wife Harriet Courtney, in the lifetime of J. C. Courtney, had made a deed to the three boys; that now he was ready for them, and that if they fooled with him much it would be consumed with court costs and lawyers fees. These two are corroborated to some extent by a third, who heard part of the conversation. This would imply, because of dates, that counsel had either testified to a falsehood when he said he had seen the deed earlier, or that he had been mistaken. Counsel however denied that he had had such conversation with the other lawyers, and so the matter rested in the record.

Whether counsel saw this deed after the death of J. C. Courtney at the time and under the circumstances he said he did or not, to our minds it would only show, in any event, that Mrs. Courtney never destroyed the deed made before the will that she was directed to destroy, until after the death of her husband, and, that if the deed he says he saw is the deed he is attempting to set up by the bill, it is then manifest from the evidence that Mrs. Courtney never showed him the deed which her husband directed her to destroy, because the provisions of that deed carried in it a charge of $500 in favor of each of the girls, which the deed he affirms by the bill omits entirely. For we think it appears indubitably from the evidence that this first deed executed before the will had been wholly reconsidered before any delivery and the will substituted therefor.

There can be no doubt about the signing and acknowledging of this first deed before Christenberry, who testified to this effect. He stated that he did not read this deed, but they stated to him that they were deeding it to their three boys. He said the deed was on a printed form, and asked to state "whether it was very long before the death of John C. Courtney," he replied: "Yes, sir, my recollection is that it was something like from one to two years." He stated, however, that he had no way to fix the date, but the date of this deed was by the other evidence in the case which we shall quote indubitably fixed anterior to the will, which was executed on May 5, 1918. J. C. Courtney died February 1, 1919. If, therefore, the date of this acknowledgment was even one year before his death, it

was not the deed that Jackson prepared for Mrs. Courtney, and sent to her on November 9, 1918.

It is insisted for original complainants that the continuation sheet was a part of this deed. How it became detached from the acknowledgment and other parts of the deed to which it was claimed it was attached, so as to escape consumption by the fire is left wholly to conjecture; but that this deed that was acknowledged before Christenberry had an earlier date than the one prepared by Jackson November 9, 1918 is, we think, established by the greater weight of the evidence.

Edith Jernigan, a daughter, testified that at the time of her father's death she was single and stayed at home, and did most of the writing for her father at the time he was sick; stayed in the house, did the house work and waited on her father, such as reading and writing; that she remembered the time when Mrs. Courtney went to Oliver Springs to get a deed drawn, and remembered the time when Mr. James Underwood, an attorney came to their home and drew a will; that the deed was drawn before the will; that she was there; that her father was dissatisfied with the deed; that the deed was to the boys, was to give the girls $500 apiece, and he was afraid the boys would not pay the money to them; that he made a will to "all of us children;" that she read the deed when her mammy brought it home to papa; that her father went before Christenberry to have it acknowledged, and went in a buggy; that she remembered this distinctly, and that after this he got dissatisfied with the deed and sent for Mr. Underwood; that her father kept the deed in a cigar box he called a deed box, with his other papers, in a table drawer in another room, and had access to it at all times. She was asked:

"Q. Now when you read the deed, had it been sent by mail, or did your mother bring it? A. Mammy went and brought it herself."

(Note: Jackson testified that the deed he drew was mailed to Mrs. Courtney on November 9, 1918.)

"Q. Are you positive it was not mailed? A. Yes, sir.

"Q. Do you know who wrote the deed? A. Well, the way I understood them to say, Jackson wrote it.

"Q. But you don't know who wrote it? A. I just heard them talk it over, I don't know."

She testified that she never know of any other deed; that if he had gone away from home to sign any other she would have known of it; that he did not go away to sign any other; that there was no other deed in that box, and that she thought it was destroyed; that her father told her mother to do it.

As contradicting her mother she stated that she never heard her father say that if the girls got any home they would have to marry a man with it, or anything along that line; but that before her father and mother sent for Underwood to draw the will it was talked over there in the presence of the children that they were getting the will made; she said her papa was not satisfied, that "he would cry about it, and said he was afraid the boys would not do us right, and was afraid the boys would not pay us, and said he would make a will, and said all of us would share alike in it," and that that was the reason for sending for the lawyer. She testified further that Qualls moved away from there in the spring of 1917, and that the deed was before that; that her father died February 2, 1919. She testified that her mother probated the will, but that she did not like what was in the will; it prohibited her from marrying; she grumbled about it, and told several people about the way papa had made the will; that her mother took the personal property, horses, cattle, and things like that on the place.

The will was dated May 5, 1917, and of course the deed spoken of by this sister made before this date was not the deed drawn by Jackson on November 9, 1918 and sent by mail to Mrs. Courtney. The testimony of the daughter that the deed was made before this date is abundantly corroborated.

Maggie Burris, a daughter, thirty-three years old, living on her father's farm, understood that something was coming to her. She said her mother wanted her to come there twice, so that her father could pay her her part; they were going to pay the girls $500 apiece, but she never went. She said, however, her brother told her he never knew anything about the deed, and never knew anything about his father asking him to his bedside to say anything about the deed.

Walter Burris testified that Sam and Esther Courtney told him that they never knew anything about their father making them a deed, and Sam was ten years old at the death of his father.

Flora Qualls, another daughter, testified that in 1917 her mother told her that her papa had made the farm to the boys, and that the boys were to pay the girls $500 each; that they were right by the woodpile near the house when she told her; that this was while they lived in the house with Mr. Qualls, before they moved away in 1917; that on Sunday, when they had the racket, she said papa did not care nothing for her, or he would not have made the will the way he did: that they were trying to settle, and had told her mother they would give her a child's part if they got it back at her death, and she did not want it that way; that she said if she could not have it the way she wanted it she would not have anything; that they were willing to do this, but that she would not accept it and filed the bill.

W. V. Jernigan (husband of the daughter) said Mrs. Courtney told him her husband had willed the place away from her if she married again, and complained about it. She said the deed was made and he had her destroy it, and then he made a will that prevented her from marrying; that if she married she would not have anything.

B. E. Qualls, the son-in-law, asked if he had ever heard Mrs. Courtney make any statement about a deed having been drawn and afterwards destroyed, and a will made that cut her out of her rights, said: "Yes, I heard her mention a deed about John—she always called him John—making a deed and she wasn't satisfied with it, and he wasn't either afterwards, and she said that he had her destroy it."

"Q. And what happened after that? A. She made away with it.

"Q. Did she complain any about that will preventing her from marrying? A. She always said she could not marry any more; that she only had a lifetime dower."

Bernice Harmon, a daughter, married since her father's death, testified that her father talked about the deed in her presence; said the girls were to get $500 each; that he got dissatisfied with the deed; said the boys might get it all and the girls get nothing; that he cried about it, and told her mother to destroy it; that after that they sent for Mr. Underwood from Clinton to draw the will; that she distinctly remembered it, could not be mistaken about it, and that this was the only deed that she ever knew of; that this deed was kept in a cigar box, her father's deed box. She testified also that in 1925, at her sister, Mrs. Burris' that her brother Sam said he did not remember anything about his father calling him and telling him that he had made a deed to him. This witness was twenty-four years old, sixteen when her father died. She testified that they said they went to Christenberry and acknowledged the deed she referred to; that her mother got mad about the will, and said he did not intend for her to marry any more. On cross-examination she testified:

"Q. If the deed set up in the bill is not the correct deed that your father and mother made to the three boys, will you tell the court wherein the deed that you attempt to testify about is different from the one copied in the bill? A. Well, the one I knew about, the boys were to pay the girls $500 apiece, and it was not in the last one in the bill.

"Q. Do you mean in the last deed? A. No, sir, it was in the first one, the only one I ever knew anything about, before the will was ever made.

"Q. So as a matter of fact you admit that your father and mother executed.and delivered to the boys a deed for the lands involved in this cause? A. They did not deliver it to the boys.

"Q. I hand you Exhibit C to the original bill in this cause, and ask you whether you have ever seen that before? A. If I ever seen it I don't know it.

"Q. State whether the exhibit I have just handed you was attached to and made a part of the deed which you say your father and mother executed to the boys? A. Well, I don't know."

Her testimony ended with a re-examination, as follows:

"Q. A while ago Mr. Ward asked you if your father had access to the box, the deed box, and to the deed up to the time of his death, and you answered as I understood you: 'Yes.' Did you mean in that to say that the deed remained in the deed box up to the time of your father's death? A. No, sir, I don't know where it was. Mama said she destroyed it.

"Q. And at the time of his death you thought the deed was destroyed? A. Yes, sir, she said she had destroyed it.

"Q. Was it taken out of the deed box at about the time the will was made? A. Well, I don't know.

"Q. But you heard your father instruct her to destroy it? A. Yes, sir.

"Q. And that was before the will was made. A. Yes, sir."

May King, another daughter, testified that she remembered when the will was made; that they talked about the deed before that, and talked about making a will. Asked what they said, she replied:

"A. Well, I heard papa say he got dissatisfied with it, and he said he was afraid the boys would not pay the girls anything, and he wanted to fix it, so he said all would share just alike; that the boys hadn't never helped him none, and the girls had, and after that talk they had the will drawn." She was further asked:

"Q. Did your father ever call the boys up to his bed and have a deed read to them to your knowledge? A. No, sir.

"Q. Did you (he) ever tell you that he was not going to give the girls anything of the estate, or anything to that effect, and state if you got a home you would have to marry a man with a home? A. No, he never did tell me anything like that."

J. H. Qualls, seventy-four years of age, father of the son-in-law, testified that he was intimately acquainted with J. C. Courtney, knew him before he was married; that he came to his house pretty often; would slip off and come, and his folks would not know where he was; that his daughter Edith did his reading and writing for

him, and generally kept his business straight; that Courtney talked to him about having made a deed to his children to the farm he lived on; that he said he deeded his farm to his boys, and he said he saw that would not.do; that was cutting the older children out of what they had helped him make, and he told Harriet to burn the deed, and that she did; he said he was going to send for Mr. Underwood to draw him a will, and he did; he was sitting right on my porch where you are when he said it. His examination continued:

"Q. Did he say anything at the time about the boys not being able to make payment of anything? A. He said he knew that the boys could not make any payment, never could; he was satisfied they could not.

"Q. Do you know what payment he was talking about when he said this? A. He was talking about what the boys were to pay the girls; I don't remember that he said the amount that they were to pay, but he said if he didn't fix it so his wife couldn't, that she would run through with it and the children would get nothing.

"Q. After he had sent for Mr. Underwood and had his will drawn, did he tell you about that? A. Yes, he said he had his will made.

"Q. Was that after the time the deed had been drawn? A. Yes.

"Q. Did you talk with Harriet Courtney about his deed and the will after they were drawn? A. Lots of times, that is, she talked to me.

"Q. Did she tell you whether the will was made to take the place of the deed, or whether the deed was made to take the place of the will? A. She told me that the will was made to take the place of the deed; she said he had cut her out under the will, but he didn't, he never meant to do it; he aimed for her to support.

"Q. In reading the deed did you find that the boys were to pay the girls anything? A. She didn't read any deed to me, she didn't have any deed to read, she said.

"Q. What did she say that she had done with the deed? A. She said he told her to burn it, and that she burned it.

"Q. After he died did she say whether the will which she has recorded was the will she was holding under? A. Yes, she said it was.

"Q. Did you ever hear of her trying to get him to sign another deed which she had made after the will was drawn? A. She told me that she was wanting him to sign one, but he would not do it; she said he had just cut her plumb out."

His cross-examination and re-examination ended as follows:

(Cross-examination) "Q. Do you know what became of the deed prepared by Chas. C. Jackson, attorney, along during November before the death of Mr. Courtney the following February? A. I never did see any deed, I reckon that is the one that was burned up, she never did show me the deed.

"Q. The deed you have been testifying about is the deed as you understand was drafted by C. C. Jackson attorney, is it not? A. That is the one that I was speaking about and was all the one he ever told me about."

(Re-direct examination) "Q. The deed that Harriet Courtney told you she wanted J. C. Courtney to sign and he would not sign it, do you know who drafted that deed? A. No, I don't know anything about it.

"Q. When was it she told you that she wanted him to make another deed and he refused to do it? A. That was along before he died.

"Q. That was after the will was made, was it? A. Yes, sir, she said he had cut her out by the will."

Mrs. Mary Qualls, wife of the last witness mentioned, said that Mr. Courtney was up there talking about "that he had made a deed, and he said that he was not satisfied with the deed, and that he was going to have it destroyed, and that he wanted a will, was what he said."

G. W. Reed, regarding Mrs. Courtney, was asked:

"Q. Did she ever talk to you about the will that her husband made, and also a deed which she said he made? A. Yes, she told me time and again that her husband made a deed and was not satisfied with the deed, and told her to destroy it; he then made a will, and I have seen the will, but I have never seen the deed. She never told me whether or not she destroyed the deed.

"Q. What if anything did she say the deed contained relative to the interest of her girls? A. She said that after Mr. Courtney made the deed he was dissatisfied with it, because the deed provided that the boys were required to pay the girls $500 each, and that he did not think that the boys could pay that, and he made a will."

There was some further testimony of this witness regarding a conversation he had had with counsel somewhere about 1925 tending to controvert the idea that counsel had ever seen an acknowledged deed previous to that time, which counsel now claims to have seen some year and a half before that time, and which, if he did, it is manifest he had forgotten some of its material provisions; for we regard it as

quite well established from the testimony we have referred to that the deed acknowledged before Christenberry was dated prior to May 5, 1918, the date of the will, and that it contained the provisions charging the boys with $500 in favor of each of the girls, but that said deed was never delivered, that the same was directed by the deceased to be destroyed, and that the wife had said to more than one party after the death of her husband that she had destroyed it. Her claim now that she had not done so, and that she furnished it to counsel along after the death of her husband in a previous employment, serves but to discredit her without militating against the indubitable fact that before it was ever delivered he directed it to be destroyed and made the will in its stead.

While Jackson's testimony does not absolutely negative the fact that he may have drawn the first deed, (which we think is rather to be inferred that he did), it does negative the idea that this last deed, dated November 9, 1918, that Mr. Jackson testified to, and sent by mail to Mrs. Courtney, and which their amended bill claims was dated and acknowledged in December, 1918, was the deed referred to by the cloud of unimpeached witnesses as having been prepared, signed and acknowledged, though not delivered, previous to the execution of the will. It is our opinion that this last deed was gotten also from Mr. Jackson for the purpose of having Mr. Courtney sign in place of the one destroyed, but leaving out the $500 charge in favor of each of the girls, and, finding that he would not sign it, this continuation of description sheet was later taken from this deed and made to do service as a part of the original deed in the scheme; not to set up the original deed, which made some provision for his daughters, but a substitute therefor which made no provision for them whatever, notwithstanding Mrs. Courtney testified that it required the boys to pay them one dollar each.

We do not care to discuss the evidence of Mrs. Courtney further than to say her story is improbable within itself, and is contradicted in numerous particulars, as might be inferred from the discussion of the evidence heretofore had.

We are not satisfied to agree that the transaction occurred as the Chancellor has found, minus the fact of the delivery of the deed. We think no such deed as original complainants sought to set up was ever even signed by him.

It would result, therefore, that with the questions before us for review we should affirm his decree, not only upon the ground that the deed he described was not delivered, but that it was not even signed and acknowledged.

We think also that if there was proof justifying the conclusion, that he could direct a sale of the land for division without referring

any question thereon to the Master, as it was competent for him to determine this first hand upon the proof before him.

Nor is there any reversible error in the appointment of a receiver to protect the property pending the litigation and get money to pay taxes.

Upon the motion to affirm the judgment, however, because no motion for a new trial was made, it is replied that

"The defendants' counsel know the facts regarding the demand for a jury, as well as counsel representing appellants in error, they know the rules of practice in our chancery court requires the demand for a jury to be made on the first day of the term, and should a demand for a jury not be made on the first day of the term it is conclusively presumed that a trial by jury is waived, and the cause would stand for trial before the chancellor without a jury."

And again, that

"The able counsel know that the first day of the regular term of the chancery court of Roane county comes on Monday, June 6, 1927, and that on said date the Chancellor did not hold court, when the Clerk and Master adjourned court until Tuesday, July 5, 1927, and on said date, to-wit, July 5, 1927, the complainants improperly demanded a jury in the cause." And that "However, after the demand having been made, it was agreed by all parties that the demand was improperly made and out of season, and the Chancellor disregarded the demand for a jury and heard the case on the regular call of the docket."

The trouble with this insistence is that, while it appears by order of the court that a demand was properly made and the cause constituted a jury cause, we cannot try the motion upon what counsel may know of the rules of practice of the chancery court regarding jury trials which does not appear in the record. We can only get this information from the record, and we would infer from the record that what he did was in harmony with his rules. Moreover, the alleged agreement that the demand was improperly made does not appear from the record, nor does it appear that the demand for a jury to try the cause was ever withdrawn, or that the order constituting it such cause had ever been rescinded. The inference would therefore be that the actual presence of the jury was waived, but that the Chancellor heard the case as of a jury; and as questions of fact were involved determining the cause, a motion for a new trial was essential in order to secure a review of the facts of the trial in this court. Citizens Trust Co. v. Motor Car Co., 154 Tenn., 507; Toomey v. Aytoe, 95 Tenn., 373-377; Choate v. Sewell, 142 Tenn., 487-489.

It is true it does not appear by any recitation that the actual presence of the jury was waived, or that the Chancellor sat as a jury, but the jury having been demanded and granted by order of the court, it was a jury cause and the Chancellor could not have heard it himself in their absence without a waiver of such absence; and, having heard it, the presumption would be that the presence of the jury was waived and the cause heard by him in their stead.

For these reasons all assignments of error are overruled, and the decree of the Chancellor is affirmed, with costs of appeal against appellants and their security on the appeal bond filed as aforesaid.

The cause will be remanded to the chancery court for the carrying out of the decree of the Chancellor, and other costs will be and remain as adjudged by him.

Portrum and Thompson, JJ., concur.